UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | |
|---|---|
| JUDY ANN BARYSCH, | Civil No. 10-5007 (RHK/LIB) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | |
| Defendant. | |

Plaintiff Judy Barysch seeks judicial review of the decision of the Commissioner of

Social Security ("Commissioner") denying her application for disability insurance benefits

("DIB").  The matter was referred to the undersigned United States Magistrate Judge for Report

and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1.  This Court has

jurisdiction over the claims pursuant to 42 U.S.C. §§ 405(g) and 1283(c).  Both parties submitted

motions for summary judgment.  For the reasons set forth below, the Court recommends that

Plaintiff's motion for summary judgment be DENIED and the Defendant's motion for summary

judgment be GRANTED.

I.      **BACKGROUND**

        A.      **Procedural History**

        On October 19, 2007, Plaintiff filed an application for disability commencing on August

7, 2006.  (Tr. 109).[1]  The Commissioner denied the claim.  (Tr. 45-50).  Subsequently, Plaintiff

filed a Request for Reconsideration which the Commissioner denied on March 14, 2007.  (Tr.

55).  Plaintiff filed a Request for Hearing by Administrative Law Judge. Administrative Law

---

[1] Throughout this Report and Recommendation, this Court refers to the administrative record [Docket No. 5] for the present case by the abbreviation "Tr."

Judge ("ALJ") David Gatto conducted a hearing on November 10, 2009.  (Tr. 26-44).  After the

hearing, the ALJ issued a decision denying Plaintiff's request for benefits on January 19, 2010.

Id.  The ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act.

Id.  Plaintiff sought review of the decision with the Appeals Council, but it denied review.  (Tr.

1-4).  Thus, the ALJ's decision became the final decision of the Commissioner.  See 20 C.F.R.

§§ 404.981, 416.1481.

      **B.**      **Factual History**

      Plaintiff graduated from high school and was 58 on the date of the ALJ's hearing.  (T.

30).  Before the onset of disability, Plaintiff worked as a receptionist and an assembler.  (Tr.

231).

      At the hearing, Plaintiff testified that on a typical day she did not do much but watch

television.  (Tr. 31).  Plaintiff further indicated that she liked to read "whodunit" books.  (Tr. 36).

Plaintiff performed no housework.  (Tr. 31).  Plaintiff's 83 year old mother and her brother did

her housework.  (Tr. 31).  In addition, Plaintiff's mother generally did her grocery shopping

because Plaintiff could only go to stores that had motorized carts.  (Tr. 31).  Due to her medical

condition, Plaintiff's mother sometimes had to help her get dressed.  (Tr. 36-37).

      Plaintiff further testified that she could only sit comfortably for five or ten minutes before

her legs became numb and her feet swollen.  (Tr. 32).  Plaintiff can only stand for three to five

minutes before she breaks into a sweat and her left leg goes numb.  (Tr. 33).  Since doctors

informed her that she needed to elevate her legs straight out, Plaintiff elevates her legs most of

the day.  (Tr. 33).  Plaintiff stated that she can walk about fifteen to twenty feet and could use

stairs only if railings were present on both sides.  Id.  Plaintiff opined that she needed a wheeled

walker to walk.  (Tr. 35).

C.      **Medical Evidence in the Record**

Plaintiff was first treated by Dr. Kara Pettigrew for her diabetes.  On December 13, 2006, Plaintiff presented with high blood pressure. (Tr. 284).  She reported that she thought her blood pressure was high because she was running around all day shopping with various activities.  (Tr. 284).

On May 10, 2007, Plaintiff received treatment from Ms. Butte, Plaintiff's treating nurse practitioner, for treatment of Type 2 diabetes mellitus. (Tr. 268).  Ms. Butte found that the diabetes was being managed through diet and oral agents.   (Tr. 268).  Ms. Butte noted that Plaintiff's extremities were normal, her gait was normal, her reflexes were normal and symmetric, and her sensation was grossly intact. (Tr. 269).  Ms. Butte found that Plaintiff suffered from renal insufficiency and autonomic neuropathy.  (Tr. 268).  Plaintiff was encouraged to check her medications more frequently and to exercise.  (Tr. 269).

Plaintiff again presented to Ms. Butte for treatment of her diabetes on August 9, 2007. (Tr. 262).  Ms. Butte noted that Plaintiff was being treated with diet and oral agents.  (Tr. 262). Ms. Butte found that Plaintiff's extremities were normal, her gait was normal, her reflexes were normal and symmetric, and her sensation was grossly intact.  (Tr. 348).  She additionally noted that Plaintiff suffered from renal insufficiency and neuropathy.  (Tr. 263).  Plaintiff reported to Ms. Butte that she could not stand for more than 30 minutes and has difficulty walking due to bilateral foot and leg pain.  (Tr. 263).

On August 16, 2007, Plaintiff presented for diabetes monitoring.  (Tr. 335).  The provider instructed Plaintiff regarding how to give herself Lantus insulin injections.  (Tr. 335). Additionally, the provider informed Plaintiff about basic diabetes care, the importance of regular exercise, carb counting, and blood sugar testing.  (Tr. 335).

Plaintiff saw Dr. Canas from Kidney Specialists of Minnesota for treatment of renal failure.  During Plaintiff's initial appointment with Dr. Canas on August 30, 2007, he noted that recent labs showed Plaintiff's creatinine to be 1.5, urine microalbumin/creatinine ratio of 3, and a serum potassium of 5.7.  (Tr. 246).  Dr. Canas found that Plaintiff had normal gait and station, normal muscle strength and tone.  (Tr. 247).  He also reported that Plaintiff was feeling well. (Tr. 247).   He noted Plaintiff suffered from stage 3 chronic kidney disease, hypertension, type 2 diabetes mellitus, and hyperlipidemia.  (Tr. 246).  The Plaintiff informed Dr. Canas that she spent a great deal of time poolside caring for children.  (Tr. 248).  Dr. Canas observed that Plaintiff would "be a good candidate for bariatric surgery . . . Dramatic wt loss may 'cure' her glucose intolerance."  (Tr. 248).  After the appointment, Dr. Canas provided a report to Ms. Butte.  He noted that Plaintiff has difficulty controlling blood glucose and recently had transitioned to insulin and had been taken off metformin/glyburide combo pills.  (Tr. 255).

On September 5, 2007, Plaintiff appeared for imaging of her kidneys.  (Tr. 241).  The imaging showed an unremarkable left kidney with a small amount of postvoid residual.  (Tr. 241).  The right kidney was not visualized which may have been due to overlying bowel gas, but an atrophic kidney could not be excluded.  (Tr. 241).

Plaintiff appeared for a diabetes education visit on September 6, 2007.  (Tr. 332).  The Plaintiff's blood glucose response to insulin was slow despite rather rapid up titration of Lantus, which is used to treat diabetes.  (Tr. 332).  The provider reviewed the importance of food choices and regular exercise in lower blood sugar control, but Plaintiff refused an appointment with a dietician.  (Tr. 332).

A Diabetes Education Progress Note dated October 15, 2007 shows Plaintiff's blood glucose was in target range using current meds. (Tr. 329). Plaintiff received information regarding the importance of food choices and regular exercise in blood sugar control. (Tr. 329).

On November 5, 2007, Ms. Butte treated Plaintiff for Type 2 diabetes and found that Plaintiff's home blood sugar levels had improved in the last three weeks. (Tr. 414). Ms. Butte objectively observed that Plaintiff had neuropathy. (Tr. 414). Additionally, Ms. Butte concluded that Plaintiff only had moderate limitations in extending extremities and in lateral bending. (tr. 415).

Dr. Canas provided Ms. Butte with a report of Plaintiff's progress regarding chronic renal failure on November 13, 2007 after seeing the Plaintiff on November 12. At this visit, Plaintiff reported suffering a recent hypoglycemic event she suffered recently. (Tr. 411). He also reported that Plaintiff was feeling well. (Tr. 411). He noted that Plaintiff's hypertension status was unclear "if TRULY suboptimal since even the extra large adult bp [blood pressure] cuff was barely able to fit around her arm . . . I feel that unless an arterial line was placed, getting an accurate bp will be challenging via conventional methods." (Tr. 411). Additionally, he thought Plaintiff would be a good candidate for bariatric surgery. (Tr. 411).

Plaintiff again visited Dr. Canas on January 18, 2008. (Tr. 460). He noted that Plaintiff stated she had been feeling well overall and tolerating her meds. He also reported that Plaintiff was feeling well. (Tr. 408). Dr. Canas found that Plaintiff had normal gait and station, no skin rash, lesions, or ulcers. (Tr. 460). He noted that Plaintiff will benefit from greatly from weight loss. (Tr. 460). Similarly, Dr. Canas provided Ms. Butte with an update on January 22, 2008. He opined that "[s]ince her last visit she has been feeling well overall as well as tolerating her

current list of meds." (Tr. 408).  He also noted that Plaintiff would benefit greatly from weight loss and that her weight was up by 16 pounds giving her a BMI of 57.  Id.

In February 2008, Ms. Butte found that Plaintiff had normal gait, normal reflexes, intact sensation, but she tested positive for neuropathy.  (Tr. 405).

Dr. Canas treated Plaintiff on April 30, 2008 for follow-up on kidney disease and hypertension.  He again noted that it was difficult to determine her blood pressure and suggested that she consider being admitted to the hospital to have arterial line placed to have her true blood pressure determined.  (Tr. 446).

On May 20, 2008, Plaintiff was treated by Ms. Butte for her diabetes.   Plaintiff was being treated with diet, oral agents, and insulin injections.  (Tr. 539).  Plaintiff reported that she had a severe reaction to one of her hypertensive medications, had difficulty walking, and had not left the house in over a month. (Tr. 539).  Ms. Butte noted that Plaintiff suffered from morbid obesity and gained 14 pounds since her last visit.  (Tr. 539).  She was unable to bend to put her shoes and socks on and cannot pick up anything off the floor without assistance.  (Tr. 540). Plaintiff's complications from diabetes include severe hypoglycemic reactions, renal insufficiency, painful neuropathy and loss of lower extremity protective sensation.  (Tr. 540). Ms. Butte also noted that Plaintiff's peripheral pulses were decreased and her feet were swollen, warm, and atrophic with a loss of longitudinal arch.  (Tr. 539).  Ms. Butte observed that Plaintiff walks with difficulty and uses a cane.  (Tr. 541).

On June 12, 2008, Dr. Canas indicated that Plaintiff would be a good candidate for bariatric surgery, but she indicated that she was not interested.  (Tr. 506).

A diabetes education progress note dated July 22, 2008 stated that Plaintiff presented dietary consulting.  (Tr. 550).  The provider recommended that Plaintiff decrease fat intake,

watch portion sizing, and follow diet and exercise guidelines to normalize blood glucose.  (Tr. 551).

Plaintiff presented to Ms. Butte for treatment of diabetes on October 14, 2008.  Plaintiff reported that her blood sugar was in poor control.  (Tr. 533).  Ms. Butte noted that Plaintiff was currently being treated with diet, oral agents, and insulin objections.  (Tr. 533).  Ms. Butte found that Plaintiff's gait was normal, reflexes were normal, sensation was grossly intact, and extremities and feet were normal on October 14, 2008.  (Tr. 535).   Ms. Butte discussed risks of uncontrolled diabetes and gastric bypass.  (Tr. 535).

On November 19, 2008, Plaintiff presented for treatment with Dr. Canas for a follow up regarding hypertension.  (Tr. 500).  He noted that Plaintiff indicated she has been feeling well.  (Tr. 500).  In a letter to Ms. Butte recapping the visit, he noted that it was still difficult to get a blood pressure reading for Plaintiff and she refused to be admitted for an arterial line placement to determine her true blood pressure.  (Tr. 513).  Dr. Canas again noted that Plaintiff was not interested in bariatric surgery.  (Tr. 513).

Likewise, Dr. Canas provided a report to Ms. Butte regarding his treatment of the Plaintiff on November 19, 2008.  (Tr. 546).  He noted that Plaintiff had been feeling well overall and was tolerating her medications.  (Tr. 546).  Dr. Canas stated that was difficult to get an accurate blood pressure reading on Plaintiff due to her massive arms.  (Tr. 546).  However, he noted that Plaintiff was not willing to be admitted to the hospital and have an arterial line placed in her to obtain an accurate reading.  (Tr. 547).  He also recommended a sleep study, but Plaintiff was not interested.  (Tr. 547).

On January 20, 2009, Plaintiff received treatment from Ms. Butte for diabetes.  (Tr. 527).  For management, Plaintiff was prescribed dietary adjustments, oral agents, and insulin injections.

(Tr. 527).  Ms. Butte concluded that Plaintiff suffered from complications from diabetes including microalbiuminrial/proteinuria, renal insufficiency, painful neuropathy, and peripheral vascular disease.  (Tr. 527).  In addition, Ms. Butte found peripheral pulses to be decreased and discolored skin.  (Tr. 528).  Ms. Butte encouraged Plaintiff to go to the YMCA for water walking/aerobics, to continue current medication, and to diet and lose weight.  (Tr. 529).

Plaintiff presented to Ms. Butte on April 28, 2009.  (Tr. 523).  She noted that Plaintiff was currently being treated for diabetes with oral agents and insulin injections.  (Tr. 523).  She observed that Plaintiff was suffering from diabetic complications including severe hypoglycemic reactions, microalbiuminuria/proteinuria, renal insufficiency, neuropathy, and loss of lower extremity protective sensation.  (Tr. 524). In addition, Ms. Butte found that Plaintiff's extremities were normal, her gait was normal, reflexes were normal and symmetric and her sensation was grossly intact.  (Tr. 524).   Plaintiff was instructed to continue with current medication.  (Tr. 525).

On April 30, 2009, Ms. Butte wrote a letter to Plaintiff informing her that her diabetes was in poor control.  (Tr. 573).  Ms. Butte wrote a similar letter to Plaintiff on September 19, 2009.  (Tr. 568).

Again, Dr. Canas treated Plaintiff for renal failure on May 4, 2009.  On May 5, 2009, he provided a report to Ms. Butte regarding Plaintiff's progress. (Tr. 543).  He also reported that Plaintiff was feeling well. (Tr. 499).   Dr. Canas observed that it was difficult to get an adequate read on Plaintiff's blood pressure because she was unwilling to get be admitted for arterial line placement to assess her true blood pressure.  (Tr. 544).  He noted that her weight was dropping, which would greatly help her.  (Tr. 544).  He stressed lifestyle modifiers to control her hypertension rather than medications due to intolerance to medicine.  (Tr. 544).  Finally, Dr.

Canas noted that Plaintiff would benefit greatly from bariatric surgery, but she was still not interested.  (Tr. 544).

On September 11, 2009, Plaintiff presented to Ms. Butte for treatment of diabetes.  (Tr. 564).  Her treatment plan at that time included diet, oral agents, and insulin injections.  (Tr. 564). Complications included severe hypoglycemic reactions, microalbuminuria/proteinuria, rental insufficiency, peripheral vascular disease, painful neuropathy and loss of lower extremity protective sensation.  (Tr. 564).   In addition, Ms. Butte noted that Plaintiff's extremities were normal, her gait was normal, reflexes were normal and symmetric and her sensation was grossly intact.  (Tr. 524).   At this time, Ms. Butte ordered a walker to help Plaintiff ambulate.  (Tr. 566).

Ms. Butte filled out on an RFC questionnaire for Plaintiff's disability claim on January 8, 2008.  The RFC questionnaire states that she treated Plaintiff for diabetes, neuropathy in diabetes, renal insufficiency, HTN, hyperlipidemia, obesity and anerbic rhinitis for a year.  (Tr. 485).  She concluded that Plaintiff had poor prognosis and suffers from lower extremity pain, limited range of motion, lower extremity numbness, lower extremity weakness and lower extremity sensory loss.  (Tr. 486).  Plaintiff suffered from pain, other symptoms and medication side effects that interfere with her attention and concentration up to 50% of the day.  (Tr. 486). Plaintiff required a cane to walk.  (Tr. 487).  Ms. Butte concluded that Plaintiff's symptoms would interfere with Plaintiffs ability to maintain the persistence and pace necessary to engage in competitive employment. (Tr. 487).  In fact, such limitations would even prevent Plaintiff from performing part time work and cause a marked impairment of her ability to perform activities of daily living.  (Tr. 487).  Physical activity, temperature extremes, movement, and static positions were listed as triggers for flare-ups of Plaintiff's symptoms. (Tr. 488).  Ms. Butte opined that Plaintiff would likely miss four or more days of work per month. (Tr. 488).  Plaintiff's fatigue

would severely impair the Plaintiff's ability to work. (Tr. 488).  As to specific limitations, Ms. Butte concluded that Plaintiff could never lift items less than 10 pounds, cannot walk even a city block without rest or severe pain, could sit continuously for 60 minutes and stand for 5 minutes. (Tr. 488-89).  Additionally, Plaintiff could never bend, twist, stoop, climb, kneel, crouch, crawl, or walk up an incline. (Tr. 489).

Ms. Butte provided a second RFC on May 29, 2008.  She concluded that Plaintiff suffered from neuropathy from diabetes, renal insufficiency, chronic renal failure, diabetes, hypertension, and morbid obesity. (Tr. 376).  Ms. Butte opined that Plaintiff's prognosis was poor and that she suffers from painful diabetic neuropathy and chronic renal failure. (Tr. 376). Accordingly, Plaintiff's symptoms will interfere with Plaintiff's persistence and pace interfering with competitive employment. (Tr. 377).  Such limitations preclude Plaintiff from performing even part time work. (Tr. 378).  Ms. Butte stated that physical activity, movement, temperature extremes, work stress, and static positioning would exacerbate Plaintiff's symptoms. (Tr. 378). Moreover, Plaintiff would have to lie down or recline to reduce symptoms. (Tr. 378).  Due to her medical conditions, Plaintiff would likely miss work four or more times per month. (Tr. 378).   Plaintiff's conditions would cause fatigue that would severely impair Plaintiff's ability to work. (Tr. 379).  Ms. Butte concluded that Plaintiff would need to take a 15 minute break per hour. (Tr. 379).  In addition, Ms. Butte found that Plaintiff would never lift items, even those less than ten pounds, could not walk a block without pain, could sit 2 hours and stand for less than two hours. (Tr. 379, 381).  Likewise, Plaintiff could not bend, twist, stoop, climb, kneel, crouch, crawl, reach, pull, push, grasp, or walk up an incline.  (Tr. 380).  Lastly, Ms. Butte noted that Plaintiff's chronic edema from chronic renal failure make it almost impossible for her to wear shoes. (Tr. 381).

Dr. Gregory Salmi, a consulting state physician, completed an RFC form on March 6, 2008 regarding Plaintiff.  He concluded that Plaintiff could occasionally lift ten pounds, frequently lift ten pounds, stand and/or walk at least 2 hours a day, sit about 6 hours a day, and engage in unlimited pushing or pulling.  (Tr. 385).  In addition, Plaintiff could occasionally climb stairs, balance, stoop, kneel, crouch, crawl, but can never climb ladders, ropes or scaffolds.  (Tr. 386).  Dr. Salami observed that Plaitniff could be exposed to unlimited cold, heat, wetness, humidity, noise, vibration, fumes, odors, dusts, gases, poor ventilation, but could not even be moderately exposed to machinery or heights.  (Tr. 388). During an examination, Dr. Salmi found that Plaintiff's gait was normal, reflexes were normal, sensation was intact, muscle strength and tone was normal.  (Tr. 385).  Posterior tibial and dorsalis pedis pulse were not reduced.  (Tr. 385).  Peripheral pulses were normal and extremities were normal.  (Tr. 385).  He concluded Plaintiff had stage 3 chronic kidney disease of unknown etiology, which was suspected to be related to small vessel disease, diabetes, and obesity.  (Tr. 385-86).   Further, Dr. Salmi noted that Plaintiff had difficulty controlling blood sugar and was transitioned to insulin in August 2007 which she tolerated well.  (Tr. 385).

On May 19, 2008 Dr. Dan Larson, a consulting state physician, affirmed the Dr. Salmi's assessment of Plaintiff and that new information provided was consistent with the prior finding. (Tr. 478).

###    D.    Evidence from the Vocational Expert

A vocational expert, Juletta M. Harren, testified at the administrative hearing.  (Tr. 14). The ALJ asked Harren to consider what jobs a woman between the ages of 55 and 58 could perform who suffered from morbid obesity, diabetes mellitus, renal insufficiency, hypertension, and history neuropathy who was limited to performing sedentary work.  (Tr. 41).  The ALJ

further limited the question to include work involving only occasional climbing of stairs or ramps, no climbing of ladders, ropes or scaffolding; occasional balancing, stooping, kneeling, crouching or crawling; and no exposure to hazards, such as heights or moving machinery.  (Tr. 41).

In response to this hypothetical question, Harren stated that Plaintiff could perform her past work as a receptionist as it was typically performed in the national economy.  (Tr. 41). Harren additionally testified that 22,160 receptionist jobs existed in the Minnesota economy and 1,097,610 existed in the national economy.  (Tr. 41).  Similarly, Harren opined that Plaintiff could perform her past relevant work as an electronic assembler of which 5,700 jobs exist in Minnesota and 215,230 exist in the national economy.  (Tr. 41).

The ALJ asked Harren if the above hypothetical women were unable to maintain a regular work schedule would she be able to perform competitive employment.  (Tr. 42). Harren responded that such a limitation would preclude competitive employment.  (Tr. 42).  Harren further testified that if the hypothetical woman had to elevate her legs 90 degrees would be problematic.  (Tr. 43).

### E.    The ALJ's Decision

The ALJ determined Plaintiff was not disabled within the meaning of the Social Security Act. (Tr. 11).  In reaching his decision, the ALJ purported to apply the required five-step sequential analysis: (1) whether the claimant had engaged in substantial gainful activity; (2) whether the claimant had a severe impairment; (3) whether the claimant's impairment met or equaled a listed impairment; (4) whether the claimant had sufficient residual functional capacity (RFC) to return to his past work; and (5) whether the claimant could do other work existing in significant numbers in the regional or national economy.  20 C.F.R. § 404.1520(a)-(f).

At step one of the analysis, the ALJ found that Plaintiff had not engaged in substantial work since August 7, 2006, the alleged onset date.  (Tr. 16).  Next, at step two, the ALJ determined that Plaintiff suffered severe impairments including diabetes mellitus with neuropathy, renal insufficiency, hypertension, and morbid obesity.  Id.

Turning to step three of the analysis, the ALJ concluded that Plaintiff's impairment or combination of impairments did not meet or equal one of the listed impairments in 20 C.F.R., part 404, subpart P, appendix 1.  (Tr. 17).  At step four, the ALJ found that Plaintiff had the RFC to perform sedentary work as defined in 20 C.F.R. 404.1567(a) and 416.967(a).  (Tr. 17). Specifically, the Plaintiff could occasionally climb stairs and ramps, but could not climb ropes or scaffolds due to obesity; could occasionally balance, stoop, kneel, and crouch, but could never crawl due to obesity; and she cannot be exposed to hazards such as heights or moving machinery due to her obesity.  (Tr. 17).

In analyzing Plaintiff's RFC, the ALJ used a two step process.  (Tr. 17).  First, the ALJ determined whether there was an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's pain or other symptoms. Id.  Second, once the ALJ identified an underlying physical or mental impairment, he evaluated the intensity, persistence and limiting effects of the claimant's symptoms to find out the extent to which the claimant's basic work activities were limited.  Id. If objective medical evidence did not substantiate the claimant's statements about intensity, persistence or symptoms, the ALJ made a finding on the credibility of Plaintiff's statements about the limiting effects of his impairments by considering the record as a whole.  Id.

Beginning with the first prong of the step four analysis, the ALJ found Plaintiff's medically determinable impairments could reasonably be expected to cause her alleged

symptoms. (Tr. 17). However, at the second prong, the ALJ determined the claimant's statements concerning the intensity, persistence and limiting effects of the symptoms were not credible because they were inconsistent with the RFC assessment formulated by the ALJ after his analysis of the record. (Tr. 17-18). The ALJ found that the objective medical evidence, the claimant's course of treatment, the claimant's work history, and her activities of her allegations support the RFC. (Tr. 18). Specifically, while the medical evidence evinced that claimant's symptoms had increased, it did not demonstrate any limitations above the RFC finding made by the ALJ. (Tr. 18). Additionally, the ALJ noted that the Plaintiff's daily activities such as running errands and spending time at a pool are inconsistent with her alleged impairment. (Tr. 20).

In making his determination, the ALJ considered the opinion of Plaintiff's treating nurse practitioner, Ms. Butte. (Tr. 20). However, the ALJ declined to place significant weight on the opinion because her treatment notes were in his determination inconsistent and internally contradictory. (Tr. 20).

Finally, at the fifth step of the analysis, the ALJ concluded that Plaintiff could perform her past relevant work as a receptionist or as an assembler. (Tr. 20). The ALJ relied on the testimony of the vocational expert to make this finding. (Tr. 20). Therefore, the ALJ concluded Plaintiff was not disabled as defined by the Social Security Act.

## II.   STANDARD OF REVIEW

Congress imposed standards for determining whether a claimant is entitled to Social Security disability benefits. "Disability" means "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."

42 U.S.C. § 423(d)(1)(A).  To be eligible for benefits, an individual's impairments must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

Judicial review of the Commissioner's decision to deny disability benefits is constrained to a determination of whether the decision is supported by substantial evidence in the record as a whole.  Tellez v. Barnhart, 403 F.3d 953, 956 (8th Cir. 2005).  Substantial evidence means more than a scintilla, but less than a preponderance.  Slusser v. Astrue, 557 F.3d 923, 925 (8th Cir. 2009).  The substantial evidence test requires "more than a mere search of the record for evidence supporting the [Commissioner's] findings." Id.  Rather, the court "must take into account whatever in the record fairly detracts from its weight." Id. (quoting Universal Camera Corp. v. Nat'l Labor Relations Bd., 340 U.S. 474. 488 (1951)).

When reviewing the record for substantial evidence, the Court may not reverse the Commissioner's decision simply because substantial evidence exists to support the opposite conclusion.  Baker v. Heckler, 730 F.2d 1147, 1150 (8th Cir. 1984).  Moreover, the Court may not substitute its own judgment for findings of fact for those of the administrative law judge. Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).   The court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Dew v. Comm'r of Social Sec., 2010 WL 3033779 at *16 (D. Minn. 2010) (quoting Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987)).  After balancing the evidence, if it is possible to reach two inconsistent positions from the evidence and one of those positions represents the Commissioner's decision, the court must affirm the decision.  Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).  Thus, the Court will not reverse the ALJ's "denial of benefits so long

as the ALJ's decision falls within the 'available zone of choice.'" <u>Bradley v. Astrue</u>, 528 F.3d

1113, 1115 (8th Cir. 2008).  The decision of the ALJ "is not outside the 'zone of choice' simply

because we might have reached a different conclusion had we been the initial finder of fact." <u>Id</u>.

## III.    DISCUSSION

In this case, Plaintiff challenges the ALJ's decision on four grounds.  First, Plaintiff

contends that the ALJ erred in improperly discounting the testimony of the Plaintiff regarding

her impairment and functional ability.  Second, Plaintiff argues that the ALJ improperly

discounted the medical opinion of her treating physician, Ms. Mary Butte, NP.  Third, Plaintiff

asserts that the ALJ erred in his assessment of Plaintiff's RFC.  Lastly, Plaintiff challenges the

ALJ's conclusion that Plaintiff could perform her past relevant work.

### A.    Whether the ALJ Improperly Discounted Plaintiff's Testimony Regarding her Impairment and Functional Ability

In making his RFC determination, the ALJ determined that the Plaintiff's statements

concerning the intensity, persistence and limiting effects of his symptoms were not credible to

the extent they were inconsistent with the RFC formulated by the ALJ after his review of the

record.  (Tr. 18).  In particular the ALJ found that "[i]n terms of the claimant's alleged

limitations, the undersigned finds that the objective medical evidence, the claimant's course of

treatment, the claimant's work history, and her activities of daily living erode the credibility of

her allegations but support the limitations articulated in the above residual functional capacity."

(Tr. 18).  Moreover, "[a] longitudinal review of the objective medical evidence reveals that the

claimant has experienced an increase in symptoms since her alleged onset date, but nothing in

the objective medical evidence reveals limitations great that in the above residual functional

capacity. [sic]."  (Tr. 18).  Specifically, as relevant here, the ALJ pointed out that Plaintiff's

blood pressure was elevated because she had been "running around all day shopping with various

activities" which was inconsistent with her allegations.  (Tr. 19).   Likewise, Plaintiff reported to

Dr. Canas that she had been spending a lot of time at the pool caring for children.  (Tr. 19).   The

ALJ found "[s]pending such significant time in leisure activities and in caring for children is

inconsistent with the claimant's allegations and her reports of her activities of daily living,

further eroding the credibility of her allegations."  (Tr. 19).

Plaintiff argues that this finding is improper because the record as a whole supports the

Plaintiff's testimony as to the severity of any alleged impairments.  (Pl's Mem., p. 16).  Plaintiff

points to the fact that she does not do any housework or shopping and receives help with those

tasks from her mother and brother. (Pl's Mem., p. 16) (citing Tr. 31).  Plaintiff additionally

receives help dressing from her mother.  Id.

The governing law makes clear that credibility determinations are initially within the

province of the ALJ.  Driggins v. Bowen, 791 F.2d 121, 124 n. 2 (8th Cir. 1986); Underwood v.

Bowen, 807 F.2d 141, 143 (8th Cir. 1986).  Courts "'will not disturb the decision of an ALJ who

considers, but for good cause expressly discredits, a claimant's complaints of disabling pain.' "

Gonzales v. Barnhart, 465 F.3d 890, 895 (8th Cir. 2006); see also Pearsall v. Massanari, 274 F.3d

1211, 1218 (8th Cir. 2001) ("The credibility of a claimant's subjective testimony is primarily for

the ALJ to decide, not the courts.").   As a finding of fact, the determination must be supported

by substantial evidence on the record as a whole.  See Stout v. Shalala, 988 F.2d 853, 855 (8th

Cir. 1993).  To make an express credibility determination, the ALJ must set forth the

inconsistencies in the Record which led to the rejection of the Plaintiff's testimony, must

demonstrate that all relevant evidence was considered and evaluated, and must detail the reasons

for discrediting that testimony.  See Shelton v. Chater, 87 F.3d 992, 995 (8th Cir. 1996); Hall v.

Chater, 62 F.3d 220, 223 (8th Cir. 1995).

The evaluation of the Plaintiff's subjective symptoms include the Plaintiff's prior work record and the observations of third parties, and of physicians, concerning: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the reported subjective symptoms; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions.  Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).   Other relevant factors are the claimant's work history and the objective medical evidence. Haggard v. Apfel, 175 F.3d 591, 594 (8th Cir. 1999). A claimant's daily activities are a "factor to consider in evaluating subjective complaints of pain." Wilson v. Chater, 76 F.3d 238, 241 (8th Cir. 1996).  By the same token, "[i]nconsistencies between subjective complaints of pain and daily living patterns may also diminish credibility." Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996).  Although daily activities, standing alone, do not disprove the existence of a disability, they are an important factor to consider in the evaluation of subjective complaints of pain. See Wilson v. Chater, 76 F.3d 238, 241 (8th Cir. 1996).  Not every factor need be discussed by the ALJ, and as long as the ALJ "gives a good reason" for discrediting a claimant's credibility, "[the court] will defer to its judgment." Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001) (citing Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1996)).

In making his decision to discredit Plaintiff's subjective complaints of pain, the ALJ relied on evidence in the record demonstrating that Plaintiff's reported daily activities were inconsistent with her complaints regarding the persistence and intensity of her pain. The record supports this conclusion.  For example, Plaintiff informed Dr. Canas on August 30, 2007 that she spends a great deal of time poolside caring for children.  (Tr. 248).  Additionally, on December 13, 2006, Plaintiff reported that she thought her blood pressure was high because she was running around all day shopping with various activities.  (Tr. 284).  When a claimant's daily

activities indicate lesser impairments than claimed, the ALJ may conclude that they diminish claimant's credibility. See e.g., Haley v. Massanari, 258 F.3d 742, 748 (8th Cir. 2001) (finding that the claimant's daily activities, including driving, cooking, shopping, visiting friends and relatives and watching television, were inconsistent with the plaintiff's claimed level of impairment); Riggins v. Apfel, 177 F.3d 689, 693 (8th Cir. 1999) (finding activities such as driving, shopping, visiting with relatives and watching television were inconsistent with plaintiff's level of pain).

In addition, contrary to the Plaintiff's arguments, the ALJ did not rely solely on Plaintiff's daily activities to discount her credibility. The ALJ also based his credibility decision on other factors, specifically conflicts between Plaintiff's complaints regarding disabling pain and the objective medical evidence, Plaintiff's course of treatment, and her work history. As to objective medical evidence in the record, the ALJ noted that up to August 2007, fourteen months after Plaintiff's alleged onset date, the Plaintiff's "treating practitioner [Ms. Butte] noted no objective findings to support the claimant's allegations." (Tr. 18). However, starting in October 2007, Ms. Butte "began to note intermittent symptoms that would reasonably limit the claimant's exertional capacity," but only one note evinced any "objective medical evidence of a decrease in range of motion." (Tr. 18). Even though the ALJ found that Plaintiff had decreased sensation and pain in her feet, he noted that the "extent of sensation loss has never been documented by EMG or other objective testing." (Tr. 18).

Other inconsistencies were also noted. For example, the ALJ observed that in May 2008 Ms. Butte found that Plaintiff's "peripheral pulses were decreased and her feet were swollen, warm, and atrophic with a loss of longitudinal arch." (Tr. 18-19). But 5 months later, Ms. Butte concluded that the Plaintiff had "normal extremities with no deformity, edema or skin changes"

and her "gait, reflexes, and sensation were noted to be normal and filament testing revealed no

loss." (Tr. 19).   The ALJ opined that Dr. Canas also found that Plaintiff had normal gait and

station with no significant changes in her functioning or symptoms after Ms. Butte noted positive

neuropathy and other foot findings. (Tr. 19). When summarizing the medical evidence, the ALJ

aptly noted that "[w]hile the undersigned accepts that the claimant have [sic] decreased sensation

and some pain in her feet, it is noted that the extent of that sensation has never been documented

by EMG or other objective testing." (Tr. 18).

Thus, the ALJ relied on a plethora of objective evidence that did not support Plaintiff's

claims of disabling pain and diminished her credibility.  "Although an ALJ may not disregard a

claimant's subjective pain allegations solely because they are not fully supported by objective

medical evidence, an ALJ is entitled to make a factual determination that a claimant's subjective

pain complaints are not credible in light of objective medical evidence to the contrary."

Gonzales, 465 F.3d at 895 (citations and quotations omitted).

Additionally, the ALJ also relied on Plaintiff's refusal to pursue recommended treatment

in support of his credibility finding.  Dr. Canas recommended on numerous occasions that the

Plaintiff undergo blood pressure testing through an arterial line because he was unable to obtain

an accurate reading. (Tr. 411, 466, 513, 544). However, the Plaintiff refused such treatmnet.

Additionally, Dr. Canas noted that Plaintiff's symptoms could be relieved if the Plaintiff lost

weight. (Tr. 248, 460, 544).  He recommended that the Plaintiff undergo bariatric surgery, but

she refused. (Tr. 248, 411, 460, 506, 513, 544).   As the ALJ noted, "[t]hat the claimant has been

unwilling to pursue recommended treatment to assess and alleviate her impairments suggest that

her symptoms are not as limiting as she has alleged." (Tr. 19). The ALJ is entitled to discount

Plaintiff's subjective complaints of disabling pain in light of her failure to follow her doctor's

recommendations.  See Mouser v. Astrue, 545 F.3d 634, 638 (8th Cir. 2008); Nelson v. Sullivan, 966 F.2d 363, 367 (8th Cir. 1992).

While undoubtedly some of the evidence in the record could support a finding that some of Plaintiff's subjective complaints coincide with some of the objective evidence, the Court must uphold the ALJ's "denial of benefits so long as the ALJ's decision falls within the 'available zone of choice."  Bradley, 956 F.2d at 838.  In the present case, although a close call, the Court finds that the ALJ's credibility decision does fall within the zone of choice presented to him.

**B.    Whether the ALJ Improperly Discounted the Medical Opinion of Plaintiff's Treating Provider**

In making his decision, the ALJ declined to give the opinion of Plaintiff's treating nurse practitioner, Ms. Butte, significant weight because her treatment notes were inconsistent and internally contradictory.  (Tr. 20).  Instead, the ALJ placed great weight on the opinion of the consulting medical examiner because it was consistent with the record as a whole.  (Tr. 20).

Plaintiff argues that the ALJ improperly discredited Ms. Butte's opinion.  According to the Plaintiff, Ms. Butte's treatment records are not inconsistent as the ALJ contends.  (Pl's Mem., p. 19).  Moreover, the Plaintiff avers that the records are consistent with the Plaintiff's complaints of pain, examinations, test results, and diagnoses.  Id.  Plaintiff argues that the ALJ pointed to objective findings of symptoms, but then cited visits to Ms. Butte where no objective findings were made as evidence of contradictory findings.  Id.  Such reliance was improper according to the Plaintiff.

"[A] treating physician's opinion is given 'controlling weight' if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.' "  Dolph v. Barnhart, 308 F.3d 876, 878 (8th Cir. 2002). However, a treating physician's opinion "do[es] not automatically control, since the record must

be evaluated as a whole." <u>Bentley v. Shalala</u>, 52 F.3d 784, 786 (8th Cir. 1995).   An ALJ may discount a treating physician's medical opinion, and adopt the contrary medical opinion of a consulting physician, when the treating source's statements are conclusory, unsupported by medically acceptable clinical or diagnostic data, or when the ALJ's determination is justified by substantial evidence in the record as a whole.   <u>See</u> <u>Rogers v. Chater</u>, 118 F.3d 600, 602 (8th Cir. 1997); <u>Ghant v. Bowen</u>, 930 F.2d 633, 639 (8th Cir. 1991).   The opinion of a treating physician may also be discounted if other assessments are supported by better, or by more thorough, medical evidence.   <u>See</u> <u>Wagner v. Astrue</u>, 499 F.3d 842, 849 (8th Cir. 2007); <u>Ward v. Heckler</u>, 786 F.2d at 846.   In other words, the ALJ is not required to believe the opinion of a treating physician when, on balance, the medical evidence convinces him otherwise.   <u>Id</u>.

Ms. Butte served as Plaintiff's treating nurse practitioner.   She found that Plaintiff suffered from diabetes, neuropathy in diabetes, renal insufficiency, HTN, hyperlipidemia, obesity and anerbic rhinitis.   (Tr. 376, 485).   She concluded that Plaintiff had poor prognosis and suffered from lower extremity pain, limited range of motion, lower extremity numbness, lower extremity weakness and lower extremity sensory loss.   (Tr. 376, 486).   Plaintiff required a cane to walk.   (Tr. 487).   Ms. Butte opined that Plaintiff's symptoms would interfere with Plaintiffs ability to maintain the persistence and pain necessary to engage in competitive employment. (Tr. 487).   In fact, such limitations would even prevent Plaintiff from perform part time work and cause a marked impairment of her ability to perform activities of daily living.   (Tr. 377, 487).   Physical activity, temperature extremes, movement, and static positions were listed as triggers for flare-ups of Plaintiff's symptoms. (Tr. 378, 488).   Ms. Butte opined that Plaintiff would likely miss four or more days of work per month. (Tr. 378, 488).   Plaintiff's fatigue would severely impair the Plaintiff's ability to work.   (Tr. 379, 488).   As to specific limitations, Ms. Butte

concluded that Plaintiff could never lift items less than 10 pounds and could not walk even a city block without rest or severe pain. (Tr. 379, 488-89). Additionally, Plaintiff could never bend, twist, stoop, climb, kneel, crouch, crawl, or walk up an incline. (Tr. 380, 489).

However, the ALJ determined that substantial objective medical evidence in the record did not support the work restrictions found by Ms. Butte. While undoubtedly some medical records support Ms. Butte's determination, a substantial number of records also support the ALJ's determination.

On May 10, 2007, Ms. Butte noted that Plaintiff's extremities were normal, her gait was normal, her reflexes were normal and symmetric, and her sensation was grossly intact. (Tr. 269). This finding was renewed in August 2007. (Tr. 264, 348). On November 5, 2007, Ms. Butte objectively reported neuropathy, but also found that Plaintiff only had moderate limitations in extending extremities and in lateral bending. (Tr. 415). In February 2008, Ms. Butte found that Plaintiff had normal gait, normal reflexes, intact sensation, but she tested positive for neuropathy. (Tr. 405). Ms. Butte found that Plaintiff's gait was normal, reflexes were normal, sensation was grossly intact, and extremities and feet were normal on October 14, 2008. (Tr. 535). A filament test was negative. Id. On April 28, 2009, Ms. Butte noted that Plaintiff's extremities were normal, her gait was normal, reflexes were normal and symmetric and her sensation was grossly intact. (Tr. 524). Subsequently, on September 11, 2009, Ms. Butte found that Plaintiff's gait was normal, reflexes were normal and symmetric and sensation was grossly intact. (Tr. 566). These medical findings substantially support the ALJ's conclusion that they are inconsistent with Ms. Butte's RFC finding.

In addition, other medical evidence in the record supports the RFC formulated by the ALJ. On August 27, 2007, Dr. Canas found that Plaintiff had normal gait and station, normal

muscle strength and tone.  (Tr. 247).   He also reported that Plaintiff was feeling well. (Tr. 247).

This finding was renewed on November 12, 2007, January 18, 2008, May 4, 2009, and

November 19, 2008.  (Tr. 408, 411, 499, 500). Dr. Salmi, state consulting physician, concluded

that Plaintiff's muscle strength and tone were normal, feet are symmetric and had no swelling,

warmth, deformity, atrophy or bruising and no tenderness.  (Tr. 385).  Extremities were found to

be normal.  Id.   On May 19, 2008 Dr. Dan Larson, a consulting state physician, affirmed Dr.

Salmi's assessment of Plaintiff.  (Tr. 478).

     Therefore, under the applicable standard of review, the Court must agree with the

Defendant that the ALJ acted within the scope of his discretion by rejecting the opinion of Ms.

Butte and that the ALJ's decision was based on substantial evidence.

     The ALJ may discount the opinion of a treating physician if other assessments are

supported by better, or by more thorough, medical evidence. See Wagner v. Astrue, 499 F.3d

842, 849 (8th Cir. 2007).   Here, the ALJ relied upon the agency consulting physicians because

they were consistent with the record as a whole.  (Tr. 21).  Whereas, the treating doctor's RFC

opinion is not substantially supported by the objective evidence, the ALJ is entitled to rely upon

the opinions of the consulting physicians.  Furthermore, the independent opinions of the

consulting physicians were substantially similar reinforcing their consistency with the medical

evidence as a whole. In such circumstances, relying upon the opinion of the consulting physician

is proper.  See Casey v. Astrue, 503 F.3d 687, 694 (8th Cir .2007) (affirming ALJ's decision to

grant more weight to nonexamining reviewer's opinion because the opinion was consistent with

record as a whole); Woolf, 3 F.3d at 1213 (stating that the court is "not allowed to substitute [its]

opinion for that of the ALJ, who enjoys a closer position to the testimony in support of an

application") (citing Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992) (stating that a court

may not reverse merely because [other] substantial evidence would have supported an opposite decision)).

When medical evidence conflicts, as is the case here, the obligation of the ALJ is to consider "all of the medical evidence, . . . weigh this evidence in accordance with the applicable standards, and attempt to resolve the various conflicts and inconsistencies in the record." Hudson ex. rel. Jones v. Barnhart, 345 F.3d 661, 667 (8th Cir. 2003). The Court is satisfied that the ALJ properly weighed the medical opinions in the record, and afforded those opinions the weight they deserved, when considered on the Record as a whole. See Bentley v. Shalala, 52 F.3d 784, 785 (8th Cir.1995) ("It is the ALJ's function to resolve conflicts among the various treating and examining physicians.")

### C.    Whether the ALJ Erred in His Assessment of the Plaintiff's RFC and That She Could Complete Her Past Relevant Work

The ALJ found that the Plaintiff had the

capacity to perform sedentary work as defined in 20 C.F.R. 404.1567(a) and 416.967(a) except she can occasionally climb stairs and ramps, but cannot climb ropes or scaffolds due to obesity; she can occasionally balance, stoop, kneel, and crouch, but never crawl due to obesity; and she cannot be exposed to hazards such as heights and moving machinery due to obesity.

(Tr. 17).

The Plaintiff argues that the ALJ improperly formulated her RFC because he erroneously found that the Plaintiff lacked credibility and discounted Ms. Butte's opinion.  (Pl's Mem., p. 23).   Additionally, Plaintiff argues that the ALJ improperly discounted Ms. Butte's opinion that Plaintiff needed to elevate her feet while sitting.  (Pl's Mem., p. 23).

Regulations require the ALJ to consider how all of the claimant's impairments, including any symptoms such as pain cause physical and mental limitations that may affect the ability to work in formulating a claimant's RFC.  20 C.F.R. § 404.1545. "The ALJ must determine the

claimant's RFC based on all relevant evidence, including, medical records, observations of treating physicians and others, and claimant's own descriptions of his or her limitations." Masterson v. Barnhart, 363 F.3d 731, 737 (8th Cir. 2004). An ALJ must determine a claimant's RFC by considering the combination of the claimant's mental and physical impairments. Baldwin v. Barnhart, 349 F.3d 549, 556 (8th Cir. 2003). However, it is the claimant's burden, not the Commissioner's, to prove the RFC. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001) (citing Anderson v. Shalala, 51 F .3d 777, 779 (8th Cir. 1995)).

As discussed above, the ALJ properly discounted Ms. Butte's opinions and properly analyzed Plaintiff's credibility. Therefore, Plaintiff's arguments that the ALJ's RFC is improper relying upon arguments that the ALJ incorrectly weighed the physicians' opinion and wrongly decided that Plaintiff's subjective complaints were not credible have already been addressed. The ALJ's formulation of the RFC based on his conclusions regarding Plaintiff's credibility and the opinions of Ms. Butte was proper for the reasons set forth in section III.B, above.

Plaintiff raises an additional argument to contend that the RFC was improper. Plaintiff contends that the ALJ improperly discounted Plaintiff's testimony and Ms. Butte's opinion that Plaintiff needed to elevate her feet while sitting. (Pl's Mem., pp. 23-24). However, the ALJ found Plaintiff's complaints about her pain not credible and chose to grant little weight to Ms. Butte's opinion. These general adverse conclusions by the ALJ necessarily extend to Plaintiff's alleged need to elevate her legs, and therefore, the ALJ did not err by discounting Plaintiff's specific allegations regarding her need to elevate her legs.

### D. Whether the ALJ Erred in Finding that Plaintiff Could Perform Her Past Relevant Work

After formulating the hypothetical Plaintiff's RFC for the vocational expert, the ALJ concluded that the Plaintiff is able to perform her past relevant work as a receptionist or as an

assembler.  (Tr. 20).  The ALJ noted that "[i]n comparing the claimant's residual functional capacity with the physical and mental demands of this work, the undersigned finds that the claimant is able to perform it as actually and generally performed."

Plaintiff contends that the ALJ erred by finding that the Plaintiff could perform her past relevant work.  (Pl's Mem., pp. 24-25).  As to this issue, the Plaintiff again simply repackages her above mentioned arguments that the medical evidence in the record, Plaintiff's testimony, and Ms. Butte's questionnaire support Ms. Butte's RFC finding instead of the ALJ's hypothetical, Plaintiff presented to the vocational expert .  Id.

As discussed extensively above, the ALJ properly formulated Plaintiff's RFC which concluded that Plaintiff could perform work at a sedentary level.  Therefore, Plaintiff's argument that the ALJ erred in concluding that Plaintiff could perform her past relevant work is unpersuasive.

**IT IS HEREBY RECOMMENDED THAT:**

1.  Plaintiff's Motion for Summary Judgment (Docket No. 6) be DENIED;

2.  Defendant's Motion for Summary Judgment (Doc. No. 16) be GRANTED.

Dated: January 12, 2012                         s/Leo I. Brisbois
                                                Leo I. Brisbois
                                                U.S. MAGISTRATE JUDGE

### N O T I C E

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties **by January 26, 2012**, a writing that specifically identifies the portions of the Report to which objections are made and the bases for each objection. A party may respond to the objections within fourteen days of service thereof. Written submissions by any party shall comply with the applicable word limitations provided for

in the Local Rules.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  This Report and Recommendation does not constitute an order or judgment from the District Court, and it is therefore not directly appealable to the Court of Appeals.